## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JESSE KUZMA, on behalf of himself and all
others similarly situated,

      **Plaintiff,**

      v.

HEALTH CARE SERVICE CORPORATION,

      **Defendant.**

Civil Action No. 1:22-cv-217-JB-JFR

Consolidated with Civil Action No. 1:22-cv-688

## PLAINTIFFS' UNOPPOSED MOTION FOR INTERIM/FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Plaintiffs Jesse Kuzma, Jennifer Aguilar, Michelle Munoz, and Nicole Rogers ("**Plaintiffs**" or "**Named Plaintiffs**") move this court to grant final approval of the class action settlement in this matter.[1] In support of this motion, Plaintiffs assert as follows:

## I.    INTRODUCTION

Plaintiffs seek final approval of the Settlement Agreements previously submitted to the Court as Exhibit A and Exhibit B to the Motion for Preliminary Approval ("**Settlement Agreements**" or "**Agreements**"). ECF 48. Under the terms of the Agreements, Defendant Health Care Service Corporation ("**Defendant**" or "**HCSC**") will pay an amount not to exceed the Gross Settlement Amount detailed in each Agreement to resolve all claims brought by the Named Plaintiffs, Opt-In Plaintiffs,[2] and the putative class members (collectively, "**Settlement Class**

---

[1] Pursuant to the Court's April 5, 2024 Order Granting Joint Motion to Consolidate, this lawsuit has been consolidated for settlement review and approval purposes with *Aguilar et al. v. Health Care Service Corporation*, No. 1:22-cv-688, in the United States District Court for the District of New Mexico ("*Aguilar*").

[2] One individual in addition to the Named Plaintiff opted-in to this lawsuit; and 25 individuals in addition to the Named Plaintiffs opted-in to *Aguilar*. Each of these individuals is a Settlement Class Member under the Settlement Agreements.

**Members**") under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("**FLSA**"), and the New Mexico Minimum Wage Act, N.M. Stat. Ann. § 50-4-19, *et seq.* ("**NMMWA**" or "**State Wage Law**").

Because the Settlement Agreements are "fair, reasonable and adequate," provide Settlement Class Members with substantial monetary relief, and satisfy all other criteria for approval, the Court should grant this motion. Plaintiffs request the Court enter an Order, in the form attached hereto as Exhibit B, that: (1) grants interim/final approval of the Settlement Agreements, including the settlement of claims arising under the FLSA and NMMWA; (2) permanently certifies the Rule 23 Settlement Classes for purposes of the settlement only; (3) approves Class Counsel's requested attorneys' fees and litigation expenses/costs; (4) approves payment to the Third-Party Administrator; and (5) dismisses this matter and the *Aguilar* lawsuit with prejudice.

## II.    FACTUAL BACKGROUND AND COURSE OF THE LITIGATION

Jesse Kuzma filed this action on March 25, 2022. ECF 1. He filed the lawsuit to recover alleged unpaid overtime wages under both federal and New Mexico state law. The case was filed as a collective action under the FLSA and as a Rule 23 class action for the NMMWA claims. *Id.* Plaintiffs allege that "Member Care Coordinators" ("**MCCs**") and "Medical Management Specialists" ("**MMSs**") employed by Defendant in New Mexico were salaried workers who worked more than 40 hours per week without receiving overtime pay and that no exemption to the state and federal overtime laws were applicable. *Id.* Plaintiffs alleged that both MCCs and MMSs performed care coordination services to Medicaid members pursuant to Defendant's contract with the State of New Mexico.

Defendant contends that all Plaintiffs and Settlement Class Members were properly

classified as exempt from overtime pay under the FLSA and NMMWA during the relevant time period, and denies all alleged wrongdoing, liability, and damages. Defendant further denies that Plaintiffs' or the Settlement Class Members' claims are appropriate for class or collective action treatment (except for settlement purposes).

On July 14, 2022, Defendant filed a Motion to Dismiss or Strike in this lawsuit. ECF 17. In response, Plaintiffs voluntarily bifurcated the case into two separate actions. The original case, *Kuzma v. Health Care Service Corporation*, No. 1:22-cv-217, covered Defendant's current and former Member Care Coordinators (*see* Amended Complaint (ECF 24)),[3] and the new case, *Aguilar et al. v. Health Care Service Corporation*, 1:22-cv-688, was brought as a class and collective action on behalf of Defendant's current and former Medical Management Specialists and BH Care Management Specialists.

On August 25, 2022, Defendant filed a second Motion to Dismiss. ECF 26.[4] Following the completion of briefing on Defendant's motion, the Court held oral arguments on December 20, 2022. ECF 40.[5] Defendant also filed a Motion to Dismiss in *Aguilar*, which was still pending before the *Aguilar* court when the parties attended mediation. *Aguilar* at ECF 6, 16.

Pending the resolution of Defendant's motions to dismiss in this lawsuit and *Aguilar*, the parties decided to focus their efforts on resolving the litigation. The parties filed a Joint Motion to Stay Proceedings (ECF 43), which was granted by the Court on March 23, 2023. ECF 45. A similar motion was filed and granted in the *Aguilar* litigation. *See Aguilar* ECF 16-17.

---

[3] The case excluded the portion of the claims released by Member Care Coordinators who participated in the settlement reached in a prior overtime pay lawsuit, *Candelaria v. Health Care Service Corporation*, No. 2:17-cv-404, ECF 84 (D.N.M. Nov. 4, 2020) (approving class and collective action settlement).
[4] Defendant withdrew the first Motion to Dismiss as moot in light of Plaintiffs' Amended Complaint. ECF 39.
[5] The Court did not rule on the second Motion to Dismiss from the bench. ECF 40. The motion was later denied by Order on March 9, 2023. ECF 44.

III.    **SETTLEMENT NEGOTIATIONS AND MEDIATION**

In the months prior to the mediation, the parties engaged in an informal exchange of information to calculate damages. *See* Exhibit A, Declaration of Travis M. Hedgpeth, ¶ 3. This included gathering and reviewing payroll records for the Settlement Class Members. *Id.* Defendant provided this information to Plaintiffs and both parties created damage models to be used at mediation. *Id.* During this time, the parties also engaged in extensive and detailed investigation of the claims. *Id.* Plaintiffs' counsel thoroughly analyzed the merits of the case and the value of the Settlement Class Members' claims. *Id.* This included, among other things, (1) lengthy conferences with Plaintiffs and Opt-In Plaintiffs; (2) conferences with Defendant regarding the scope of production; (3) inspection and analysis of the documents and materials produced by Plaintiffs, Opt-in Plaintiffs, and Defendant; (4) analysis of the various legal positions taken and defenses raised by Defendant; (5) investigation and analysis of the duties performed by MCCs, MMSs, and BH Care Management Specialists in the performance of their work; and (6) investigation and analysis of the regulations applicable to the performance of care coordination services in the State of New Mexico. *Id.*

On May 8, 2023, the parties mediated the case in San Diego, California with the assistance of Hunter Hughes. Hedgpeth Decl. ¶ 4. Mr. Hughes is an accomplished mediator and is one of a handful of mediators to concentrate on wage and hour litigation. *Id.* Although the parties spent a full day trying to resolve the case, a settlement was not reached on the day of the mediation. *Id.* However, discussions continued after the mediation, and, on May 11, 2023, an agreement was reached. *Id.* The parties then worked together over the next several months to document the terms of the settlement in the Settlement Agreements, which were executed by counsel for the parties on

October 31, 2023. *Id.*

## IV.    SUMMARY OF PROPOSED CLASS SETTLEMENTS

The parties entered into two agreements to resolve the two cases. One agreement (the

"***Kuzma* Agreement**") resolves the claims of the following proposed "**MCC Class**" who are

individually listed on Exhibit A to the *Kuzma* Agreement:

> Individuals who worked as Member Care Coordinators for HCSC in New Mexico
> and were classified as exempt from the overtime requirements of the FLSA and the
> NMMWA between March 25, 2019 and the date on which counsel for all parties
> has executed this Agreement, except for those Member Care Coordinators who
> fully released all wage and hour claims during such time period in connection with
> the settlement of the lawsuit styled *Candelaria v. Health Care Service Corporation*,
> No. 2:17-cv-404-KG-SMV, in the United States District Court for the District of
> New Mexico.

The second agreement (the "***Aguilar* Agreement**") resolves the claims of the following proposed

"**MMS Class**" who are individually listed on Exhibit A[6] to the *Aguilar* Agreement:

> Individuals who worked as Medical Management Specialists or BH Care
> Management Specialists for HCSC in New Mexico and were classified as exempt
> from the overtime requirements of the FLSA and the NMMWA between September
> 19, 2019 and the date on which counsel for all parties has executed this Agreement.

The proposed monetary settlement shall not exceed the "Gross Settlement Amount"

detailed in the Agreements.  *See* Ex. A and Ex. B to Motion for Preliminary Approval (ECF 48-1

and 48-2).  As set forth in the Motion for Preliminary Approval, and consistent with the Settlement

Agreements, Plaintiffs' counsel is requesting a fee of 35% of the Gross Settlement Amount under

each agreement, plus reasonable costs set forth in Section IV.D.5 of the Agreements, to be drawn

from the Gross Settlement Amount.  As set forth in the Motion for Preliminary Approval, it was

estimated that settlement administration costs would not exceed $40,000. The final amount

---

[6] All Settlement Class Members for the *Aguilar* Agreement are listed on Exhibit A to the *Aguilar* Agreement
except for one individual who was inadvertently not included on Exhibit A, but who has been included in
the settlement of the case, including the notice of settlement process.

reported by the settlement administrator, and the amount now being requested, is $22,032 ($10,318 for the *Kuzma* settlement and $11,714 for the *Aguilar* settlement), to be drawn from the Gross Settlement Amount.

## V.    **PRELIMINARY APPROVAL OF SETTLEMENT AND DISTRIBUTION OF NOTICE**

On May 3, 2024, the Court preliminarily approved the Settlement Agreements "as fair, reasonable and adequate based on consideration of the criteria set forth in Fed. R. Civ. P. 23(E)(2) and relevant case law."[7] ECF 50. The Court also ruled that "[a]s requested by the parties, the Court hereby orders that the Settlement Agreements may be filed, and remain, under seal." *Id*.

As required by the Court's Order, the approved settlement notices were distributed via USPS First Class Mail to Settlement Class Members on June 17, 2024. *See* Hedgpeth Declaration ¶ 5. As required by the Settlement Agreements, each Settlement Class Member was provided the details of the settlement, including the Settlement Class Member's individual share of the settlement. *Id.* The Settlement Class Members were provided contact information (for both the Settlement Administrator and Class Counsel) to ask any questions, as well as instructions on how to object to, or opt out of, the settlements. *Id*.

If a Settlement Class Member's notice packet was returned by USPS as undeliverable without a forwarding address, the Settlement Administrator performed an advanced address search on the addresses by using Experian, a reputable search tool. Hedgpeth Decl. ¶ 6. The Settlement Administrator used the Settlement Class Member's name, previous address, and Social Security Number to locate a current address. *Id.* In addition, the Settlement Administrator promptly mailed the notice packet to updated addresses provided by USPS, Class Counsel and Class Members. *Id*.

---

[7] The service awards requested were not preliminarily approved and are therefore not included in this request for final approval.

Thirty-four (34) notice packets were returned to the Settlement Administrator as undeliverable by USPS. *Id.* The Settlement Administrator was able to locate updated addresses for all these individuals, and the notice packets were mailed to the updated addresses, none of which were returned as undeliverable. *Id.*

The 30-day opt-out/objection period ended on July 17, 2024. *Id.* ¶ 7. No Settlement Class Members objected to the settlements, and no Settlement Class Members opted out of the settlements. *Id.*

## VI.    THE PROPOSED SETTLEMENT AGREEMENTS ARE FAIR, REASONABLE, AND ADEQUATE, AND SHOULD BE APPROVED

### A.    The Standard for Approving Class Action Settlement Agreements

Fed. R. Civ. P. 23(e) provides that, before granting final approval of a settlement agreement, the Court must ensure that notice is provided to members of the plaintiff class, then conduct a hearing and thereafter find that the agreement is "fair, adequate, and reasonable." *Jones v. Nuclear Pharmacy, Inc*., 741 F.2d 322, 324 (10th Cir. 1984). "In determining whether the proposed settlement meets the standard for approval, the Court must first be concerned with the protection of the rights of the passive class members." *See* 7B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1979.1 (2d ed. 1986 &. 2001 Supp.); *Johnson v. City of Tulsa*, 2003 U.S. Dist. LEXIS 26379 (N.D. Okla. May 12, 2003).

In *Jones v. Nuclear Pharmacy, Inc.,* the Tenth Circuit identified the following four factors that a district court should consider in determining whether a proposed settlement is fair, reasonable, and adequate:

1.    Whether the proposed settlement was fairly and honestly negotiated;
2.    Whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt;
3.    Whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and,

4.      The judgment of the parties that the settlement is fair and reasonable.[8]

For nearly 40 years, the four factors outlined in *Jones* have served as the standard for approving class settlements. *See, e.g., Gottlieb v. Wiles*, 11 F.3d 1004, 1014 (10th Cir. 1993); *Rutter & Wilbanks Corp. v. Shell Oil Co.,* 314 F.3d 1180, 1188 (10th Cir. 2002); *Tennille v. W. Union Co.*, 785 F.3d 422, 434 (10th Cir. 2015); *Fager v. CenturyLink Communs.*, LLC, 854 F.3d 1167, 1174 (10th Cir. 2016).

The court should also "ensure that the agreement is not illegal, a product of collusion, or against the public interest." *United States v. Colorado*, 937 F.2d 505, 509 (10th Cir. 1994). "The fairness of the negotiating process is to be examined 'in light of the experience of counsel, the vigor with which the case was prosecuted, and [any] coercion or collusion that may have marred the negotiations themselves.'" *Ashley v. Regional Transp. Dist. & Amalgamated Transit Union Div. 1001 Pension Trust Fund*, 2008 WL 384579, at *5 (D. Colo. Feb. 11, 2008) (quoting *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir. 1983)).  "It is the responsibility of the proponents of the settlement to provide sufficient evidence to support a conclusion that the settlement is fair..." *Gottlieb v. Wiles*, 11 F.3d at 1015.

In determining whether to approve a negotiated settlement, the court must examine the agreement as a whole, rather than the individual sections, for overall fairness.  As the Ninth Circuit noted:

> While the court may either approve or deny the issuance of a consent decree, generally it is not entitled to change the terms of the agreement stipulated to by the parties. …  If the court discerns a problem with a stipulated agreement, it should advise the parties of its concern and allow them an opportunity to revise the agreement.  Ultimately, the district court is faced with the option of either approving or denying the decree … "[T]he settlement must stand or fall as a whole."

*Colorado*, 937 F.2d at 509 (quoting *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 630

---

[8] *Jones*, 741 F.2d at 324.

(9th Cir. 1982), *cert. denied*, 459 U.S. 1217 (1983).

There is strong judicial policy favoring approval of settlements in complex class action lawsuits. "It is well-settled, as a matter of sound policy, that the law should favor the settlement of controversies." *Grady v. De Ville Motor Hotel, Inc.*, 415 F.2d 449, 451 (10th Cir. 1969); *see also Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) ("Voluntary conciliation and settlement are the preferred means of dispute resolution.").

The Agreements in this case meet and surpass the legal standard for final court approval. For the reasons described below, analysis of each of the factors required by the Tenth Circuit supports granting final approval of the Agreements.

**B.     Each *Jones* Factor Supports Approval of the Settlement Agreements**

**1.     The Proposed Settlement Was Fairly and Honestly Negotiated.**

In this case, the Parties jointly seek to settle this matter and "[t]here are numerous indicia that the settlement negotiations in this case have been fair, honest and at arm's length." *Lucas v. Kmart Corp.*, 234 F.R.D. 688, 693 (D. Colo. 2006). "First, the parties to this litigation have 'vigorously advocated their respective positions throughout the pendency of the case.'" *Id*. In the more than two years since this lawsuit was filed, the Parties have maintained their respective positions and zealously advocated contested issues. The contested issues include (1) whether Plaintiffs and Settlement Class Members were properly classified as exempt from the overtime requirements of the FLSA and the NMMWA; (2) the amount of time worked each workweek by Plaintiffs and Settlement Class Members; (3) whether the *Aguilar* and *Kuzma* lawsuits could properly be certified as class or collective actions (for purposes other than settlement); and (4) motion practice and oral arguments relating to Defendant's Motions to Dismiss, which raised arguments regarding, among other things, whether the New Mexico Minimum Wage Act allowed

for a class that includes individuals with claims outside the standard 3-year limitations period.

Moreover, the lengthy nature and detailed scope of the settlement process also indicates a fair and honest settlement was reached. As noted above, the Parties spent months exchanging information and preparing separate damage models in advance of the mediation. *See* Section III, *supra*. Moreover, the parties engaged in extensive investigations of the claims, including reviewing the job duties performed by the Settlement Class Members in the performance of their work and analyzing the regulations applicable to the performance of care coordination services in the State of New Mexico. *Id.* Notably, after dedicating substantial time and resources prior to the mediation, the Parties were still not able to come to an agreement after a full day with an experienced mediator. *Id.* Even after an agreement was finally reached, the Parties spent several months negotiating the specific terms of the Settlement Agreements. *Id.*

Nothing during the negotiations indicates the settlement was anything other than "fair, honest, and at arm's length." Indeed, the protracted nature of the settlement discussions, as well as the difficulty in finally reaching an agreement, reflects how adversarial the negotiations were, with experienced counsel zealously representing their respective clients' interests. *See Lucas*, 234 F.R.D. at 693 (lengthy negotiation was evidence of arm's length negotiation).

**2.  Serious Questions of Law and Fact Exist, Placing the Ultimate Outcome of the Litigation in Doubt**

In evaluating a settlement, "[t]here is no precise formula for what constitutes sufficient evidence to enable the court to analyze intelligently the contested questions of fact.  It is clear that the court need not possess evidence to decide the merits of the issue, because the compromise is proposed in order to avoid further litigation."  Alba Conte & Herbert Newberg, NEWBERG ON CLASS ACTIONS § 11.45 (4th ed. 2002).  Although it is not the role of the Court at this stage of the litigation to evaluate the merits, "it is clear that the parties could reasonably conclude that there

are serious questions of law and fact that exist such that they could significantly impact this case if it were litigated." *Lucas*, 234 F.R.D. at 693-94. Rather, the Court must evaluate the probable outcome of litigation and the terms of the settlement and then weigh the remedies the class could secure from the settlement against the probable costs and results of litigation while not reaching "any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Officers for Justice*, 688 F.2d at 625. These cases presented several serious questions of both law and fact which could have impacted the outcome of the litigation, and there is far from any guarantee that Plaintiffs "will ultimately prevail on the merits." *McNeely v. Nat'l Mobile Health Care, LLC*, 2008 WL 4816510, at *13 (W.D. Okla. Oct. 27, 2008).

By way of example, one significant issue in the litigation[9] was whether Defendant had properly classified Plaintiffs as exempt from the overtime requirements of the FLSA and New Mexico state law. Hedgpeth Decl. ¶ 8. To assess the exemption issue under these laws, a detailed analysis of the job duties performed by the Plaintiffs would have been necessary. *Id.* This would have included an assessment of the amount of time spent performing certain duties and whether those specific duties were exempt. *Id.* Class Counsel expects that Defendant would argue it properly classified these individuals as exempt under either the professional exemption (if they had an RN license or comparable advanced degree/license) or the administrative exemption. *Id.* Plaintiffs contended that even if individuals were licensed RNs, their work did not require them to use the skills and knowledge learned in obtaining their RN designation. *Id.* Depending on the

---

[9] Although the litigation was split into two cases, both cases involved claims that certain positions were misclassified as exempt from the overtime requirements of the FLSA and the NMMWA and defenses that employees working in the positions at issue were exempt under the professional and/or administrative exemptions to the FLSA and NMMWA.

outcome of the exemption issue alone, a significant number of individuals stood to recover nothing if the litigation proceeded to conclusion. *Id.*

Another example issue is the number of hours worked by Plaintiffs. Hedgpeth Decl. ¶ 9. Plaintiffs assert they regularly worked significant overtime on a week-to-week basis. *Id.* Defendant, on the other hand, contends that overtime worked, if any, was minimal. *Id.* The difference in the outcome of this factor would have drastically affected the overall amount of the potential recovery. If the jury determined Plaintiffs did not work any overtime hours, Plaintiffs would have recovered nothing.

Defendant made clear to Plaintiffs it would rely on cases like *Williams v. Genex Services, LLC*, 809 F.3d 103 (4th Cir. 2015) to establish that Plaintiffs are exempt and not entitled to any overtime pay. Hedgpeth Decl. ¶ 10. In *Genex,* the Fourth Circuit held that "medical case management" work performed by a managed care worker, who did not provide hands-on patient care, but who interacted with medical providers and employees to ensure the provision of effective health care services while maximizing cost containment were exempt professionals. The risk of facing the same fate as the *Genex* plaintiffs, *who ended up with nothing*, was a driving factor in reaching this settlement. Hedgpeth Decl. ¶ 10. And, even if Plaintiffs won at the trial court level, Defendant would have certainly appealed to the Tenth Circuit where Plaintiffs would, again, risk ending up with nothing.

### 3. The Value of an Immediate Recovery Outweighs the Mere Possibility of Future Relief after Protracted and Expensive Litigation

The Tenth Circuit has stated that the "value of an immediate recovery" refers to "the monetary worth of the settlement." *Gottlieb v. Wiles*, 11 F.3d at 1015. "That value is to be weighed not against the net worth of the defendant, but against the possibility of some greater relief at a later time, taking into consideration the additional risks and costs that go hand in hand with

protracted litigation." *Id.* "By contrast, the proposed settlement agreement provides the class with substantial, guaranteed relief." *Lucas*, 234 F.R.D. at 694; *see also McNeely*, 2008 WL 4816510, at *13 (finding that the class "is better off receiving compensation now as opposed to being compensated, if at all, several years down the line, after the matter is certified, tried, and all appeals are exhausted"). An evaluation of the benefits of the settlement also must be tempered by the recognition that any compromise involves concessions on the part of the parties. Indeed, as explained by the Ninth Circuit, the very essence of a settlement agreement is compromise, "a yielding of absolutes and an abandoning of highest hopes." *Officers for Justice,* 688 F.2d at 624 (citation omitted).

As set forth in the previous section, just two of the many issues in this case present an all-or-nothing proposition for Plaintiffs. Yet, Defendant has agreed to pay a settlement amount to the Settlement Class Members even though they faced the risk of recovering nothing in continued litigation. The Net Settlement Fund provides for recovery of an appropriately discounted recovery even *after* the payment of attorney's fees, litigation expenses, and administration costs. Hedgpeth Decl., ¶ 11. Class Counsel believes this is an exceptional result and is certainly a fair and adequate result given the risks to the Parties in this litigation.

### 4.    Class Counsel and Plaintiffs Believe the Settlement is Fair and Reasonable

"Counsels' judgment as to the fairness of the agreement is entitled to considerable weight." *McNeely,* 2008 WL 4816510, at *13 (quoting *Lucas*, 234 F.R.D. at 695). As one district court in the Tenth Circuit put it:

> When a settlement is reached by experienced counsel after negotiations in an adversarial setting, there is an initial presumption that the settlement is fair and reasonable. *See Trief v. Dun & Bradstreet Corp.,* 840 F. Supp. 277 (S.D.N.Y. 1993) ("Absent evidence of fraud or overreaching, courts consistently have refused to act as Monday morning quarterbacks in evaluating the judgment of counsel."). Counsels' judgment as to the fairness of the agreement is entitled to considerable

weight. *See Law v. National Collegiate Athletic Ass'n,* 108 F. Supp. 2d 1193, 1196 (D. Kan. 2000).

*Marcus v. State of Kansas*, 209 F. Supp. 2d 1179, 1182 (D. Kan. 2002).

In support of their appointment as class counsel, Plaintiffs' counsel submitted their qualifications and set forth their experience in this area of the law. ECF 48-2. The Court is therefore familiar with Class Counsels' qualifications. Class Counsel believe the settlements are fair and reasonable. Hedgpeth Decl., ¶ 12. "Here, the parties' counsel—among whom are attorneys with substantial experience in complex class action litigation and [employment] class actions—unanimously support this settlement." *Lucas*, 234 F.R.D. at 695 . Importantly, Plaintiffs have reported to Class Counsel that they are also in favor of the settlement and believe it is fair and reasonable, and no Settlement Class Members chose to opt out of or object to the settlement. Hedgpeth Decl. ¶¶ 7, 12. This factor further supports granting final approval.

**C.     Class Counsel's Requested Fee**

In 2003, Federal Rule of Civil Procedure 23(h) was adopted to more specifically address fee awards in the class action setting. Rule 23(h) states, in relevant part, that "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law ...." Fed. R. Civ. P. 23(h). Generally, the Tenth Circuit reviews a district court decision awarding attorneys' fees for an abuse of discretion. *Pelican Prod. Corp. v. Marino,* 893 F.2d 1143, 1148 (10th Cir.1990).

As noted above, Class Counsel are requesting a fee of 35% of the Gross Settlement Amount. As discussed in more detail below, this represents a reasonable fee and should be approved by the Court because: (1) the Tenth Circuit, and courts in this Circuit, overwhelmingly favor using the "percentage of fund" method to determine reasonable fees; (2) 35% is well within the range of fees approved in common fund cases; (3) the *Johnson* factors support the

reasonableness of the fee; and (4) no Class Members objected to or opted out of the settlements.

      **1.**      **The Tenth Circuit, and Courts in the Tenth Circuit, Overwhelmingly Favor the Percentage of Fund Method to Determine Reasonable Fees in Common Fund Cases**

Over 40 years ago, the Supreme Court established that when, as here, counsel obtain a common fund settlement, they may seek a reasonable attorneys' fee from the fund as whole (*Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980)) and that "a reasonable fee is based on a percentage of the fund bestowed on the class." *Blum v. Stenson,* 465 U.S. 886, 900 n.l6 (1984). The Supreme Court has "explicitly described a percentage calculation as a 'reasonable fee' in [common fund] cases." *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454 (10th Cir. 1988) (citing *Blum v. Stenson*, 465 U.S. 886, 900, n.16 (1984)). The Tenth Circuit has also expressed a preference for utilizing the percentage-of-fund method in determining the reasonableness of fees in common fund cases. *See Gottlieb v. Barry*, 43 F.3d 474, 483 (10th Cir. 1994). Furthermore, as the Tenth Circuit points out, "while the Supreme Court has never explicitly addressed this issue, it has in fact always awarded fees in common fund cases on a percentage of the fund basis." *Id.* at 483 n.5.

Thus, although courts are not *required* to use a particular methodology for determining reasonable fees, courts in the Tenth Circuit overwhelmingly favor the percent-of-fund method in common fund cases. As Judge Parker explained:

> The percentage of the fund method is "the appropriate means to determine a reasonable fee ... a lodestar analysis would not be helpful in setting or even evaluating a reasonable percentage of the Common Fund." *See Ramah I,* 50 F.Supp.2d at 1097. The Tenth Circuit has made it clear that district courts need not calculate a lodestar when applying the percentage method. *See Gottlieb v. Barry,* 43 F.3d 474, 487 (10th Cir. 1994).

*Ramah Navajo Chapter v. Jewell*, 167 F. Supp. 3d 1217, 1241-42 (D.N.M. 2016) (ellipses in original). Courts in this District and throughout the Tenth Circuit agree. *See, e.g.*, *Anderson Living*

*Tr. v. Energen Res. Corp.*, No. CV 13-909 WJ/CG, 2021 WL 3076910, *7 (D.N.M. July 21, 2021)

("In the Tenth Circuit, there is a preference for determining the reasonableness of a fee award in

common fund cases utilizing 'the percentage of fund' method."); *Montgomery v. Cont'l*

*Intermodal Grp.-Trucking LLC*, No. 19-940 GJF, 2021 WL 1339305, n.5 at *7 (D.N.M. Apr. 9,

2021) ("District courts in New Mexico routinely approve attorneys' fees based on a percentage of

fund method without a lodestar cross-check.") (collecting cases); *Rhea v. Apache Corp.*, 2022 WL

18621782, at *3 (E.D. Okla. June 23, 2022) ("Oklahoma federal courts, including this Court, have

previously acknowledged the Tenth Circuit's preference for the percentage method and rejected

application of a lodestar analysis or lodestar cross check.") (collecting cases).[10]

### 2.    The Requested Fee Is Well Within the Range of Reasonable Fees Awarded in Common Fund Cases

Class Counsel's request for an award of attorneys' fees equal to 35% of the common fund

is well within the range of percentage awards made by courts in this District and in the Tenth Circuit.

---

[10] *See also Ramah Navajo Chapter v. Babbitt*, 50 F. Supp. 2d 1091, 1097 (D.N.M. 1999) (fee awards "in common fund cases should be evaluated using the percentage of fund method without a lodestar analysis"); *Barela v. Citi Corp.*, No. 1:11-cv-506-KG-GBW, ECF 93 (D.N.M Sept. 15, 2014) (awarding percentage of fund without lodestar cross check) (Gonzales, J.); *Ramah Navajo Chapter v. Kempthorne*, 2008 WL 11342943, at *5 (D.N.M. Aug. 27, 2008) (same); *Robles v. Brake Masters Sys., Inc.*, 2011 WL 9717448, at *19 (D.N.M. Jan. 31, 2011) (same); *Acevedo v. Sw. Airlines Co.*, 2019 WL 6712298, at *1 (D.N.M. Dec. 10, 2019) (same), *report and recommendation adopted*, 2020 WL 85132 (D.N.M. Jan. 7, 2020); *Daye v. Cmty. Fin. Serv. Ctrs., LLC*, 1:14-cv-759-KK-KBM, ECF 195 (D.N.M. August 15, 2019) (same); *J.O. v. Dorsey, et al.*, No. 1:11-cv-254-MCA-GBW, ECF 157 (D.N.M. Nov. 19, 2014) (same); *Jones v. I.Q. Data Int'l, Inc.*, No. 1:14-cv-130-PJK-GBW, ECF 65 (same); *Yazzie v. Gurley Motor Co.*, No. 1:14-cv-555-JAP-SCY, ECF 196 (D.N.M. Oct. 28, 2016) (same); *Chieftain Royalty Co. v. Marathon Oil Co.*, 2019 WL 7758915, at *9 (Mar. 8, 2019) (E.D. Okla. Mar. 8, 2019) (same) (collecting cases); *CompSource Oklahoma v. BNY Mellon, N.A.*, 2012 WL 6864701, at *8 (E.D. Okla. Oct. 25, 2012) (same); *Fankhouser v. XTO Energy, Inc.*, 2012 WL 4867715, *3 (W.D. Okla. Oct. 12, 2012) (same); *Droegemueller v. Petroleum Devel. Corp.*, 2009 WL 961539, *4 (D. Colo. Apr. 7, 2009) (same); *Lewis v. Wal–Mart Stores, Inc.*, 2006 WL 3505851, *2 (N.D. Okla. Dec. 4, 2006) (same); *Williams v. Sprint/United Mgmt. Co.*, 2007 WL 2694029, at *14 (D. Kan. Sept. 11, 2007) (same); *Peck v. Encana Oil & Gas, Inc.*, , 2018 WL 1010944, at *3 (D. Colo. Feb. 22, 2018) (same); *Farley v. Family Dollar Stores, Inc.*, 2014 WL 5488897, at *4 (D. Colo. Oct. 30, 2014) (same); *Chavez Rodriguez v. Hermes Landscaping, Inc.*, 2020 WL 3288059, at *5 (D. Kan. June 18, 2020) (same); *Whittington v. Taco Bell of Am., Inc.*, 2013 WL 6022972, at *6 (D. Colo. Nov. 13, 2013) (same).

*See In re Thornburg Mortg., Inc. Sec. Litig.*, 912 F. Supp. 2d 1178, 1257 (D.N.M. 2012) ("Fees in the range of 30–40% of any amount recovered are common in complex and other cases taken on a contingency fee basis."); *Cook v. Rockwell Int'l Corp.*, 2017 WL 5076498, at *1–2 (D. Colo. Apr. 28, 2017) (noting that 40% fee falls within acceptable range in Tenth Circuit); *Shaw v. Interthinx, Inc.*, 2015 WL 1867861, at *6 (D. Colo. Apr. 22, 2015) (finding 1/3 of $6 million dollar fund, or $2 million, in wage and hour case to be "well within the percentage range approved in similar cases") (collecting cases); *Blanco v. Xtreme Drilling & Coil Services, Inc.*, 2020 WL 4041456, at *5 (D. Colo. July 17, 2020) (awarding 38% fee of $850,000 settlement in wage hybrid action because it was in "line with the customary fees and awards in similar cases"); *Peck*, 2018 WL 1010944, at *3 (D. Colo. Feb. 22, 2018) (finding 37.5% fee in wage and hour hybrid action to be "well within the range for a contingent fee award") (collecting cases); *Farley*, 2014 WL 5488897, at *4 (D. Colo. Oct. 30, 2014) (30.3% fee of $2.3 million fund in wage and hour hybrid action); *Whittington,* 2013 WL 6022972, at * 6 (39% of the fund "within the normal range for a contingent fee award" in wage and hour hybrid class action); *Shaulis v. Falcon Subsidiary LLC*, 2018 WL 4620388, at *2 (D. Colo. Sept. 26, 2018) (finding 1/3 of common fund to be reasonable because the award was similar to fee awards in "similar wage and hour cases in this District"); *Williams*, 2007 WL 2694029, at *6 (awarding 35% fee in employment class action); *Enegren v. KC Lodge Ventures LLC*, 2019 WL 5102177, at *9 (D. Kan. Oct. 11, 2019) (awarding 40% of fund in wage collective action). A 35% fee award is also consistent with the percentage of fund awards in hybrid Rule 23 state wage and hour/FLSA actions nationwide. *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 472 (S.D.N.Y 2013) (awarding 1/3 of $4.9 million common fund) (citing *Willix v. Healthfirst, Inc.,* 2011 WL 754862, at *4 (E.D.N.Y. Feb. 18, 2011) (awarding one-third of $7.675 million settlement fund in FLSA and NYLL wage and hour action); and *Clark v. Ecolab, Inc.,* 2010

WL 1948198, at *8–9 (S.D.N.Y. May 11, 2010) (awarding 33% of $6 million settlement fund in

FLSA and multi-state wage and hour case); *Lenahan v. Sears, Roebuck & Co*., CIV. 02-0045, 2006

WL 2085282, at *19 (D.N.J. July 24, 2006) aff'd, 266 Fed. Appx. 114 (3d Cir. 2008) (awarding

30% fee in $15 million common settlement of federal and state wage claims, noting that "attorneys'

fees of approximately 30 percent are commonly awarded in labor and employment class actions");

*Khait v. Whirlpool Corp.*, 2010 WL 2025106, at *8 (E.D.N.Y. Jan. 20, 2010) (awarding class counsel

33% of $9.25 million settlement fund in hybrid wage case); *Duchene v. Michael Cetta, Inc.,* 2009

WL 5841175, at *3 (S.D.N.Y. Sept. 10, 2009) (awarding class counsel 32.2% of $3,150,000 fund

in hybrid tip misappropriation case); *Mohney v. Shelly's Prime Steak,* 2009 WL 5851465, at

*5 (S.D.N.Y. Mar. 31, 2009) (awarding 33% of $3,265,000 fund in hybrid wage case); *Stefaniak

v. HSBC Bank USA, N.A.*, 2008 WL 7630102, at *3 (W.D.N.Y. June 28, 2008) (awarding 33% of

$2.9 million fund in hybrid wage case); *Abadeer, et al., v. Tyson, et al.* 3:09-cv-125 (M.D. Tenn.

Oct. 17, 2014) (awarding fees in the amount of $2,583,333.00, which was equal to 33.33% of the

common fund, in hybrid FLSA Rule 23 class action).[11]

  In awarding attorneys' fees of 40% of a $25,000,000 common fund, the court in *Rhea v.

Apache Corp.* noted that, in addition to being with the normal range of fees awarded in this Circuit,

the fees were appropriate given that, as in the present case,[12] the settlement was "not a claims-

made settlement," meaning that 100% of class members (other than those that affirmatively opt

---

[11] *See also Dillworth v. Case Farms Processing, Inc.*, 2010 WL 776933, at *7 (N.D. Ohio Mar. 8, 2010) (approving attorneys' fee award of one-third of the total settlement amount in hybrid FLSA and Ohio and North Carolina state classes); *Kritzer v. Safelite Solutions*, LLC, 2012 WL 1945144 (S.D. Ohio May 30, 2012) (approving attorneys' fees and costs up to 52% of total recovery for hybrid FLSA collective and Ohio class action for unpaid overtime); *Simpson v. Citizens Bank*, 2014 WL 12738263, at *6 (E.D. Mich. Jan. 31, 2014) ("Class Counsel's request for 33% of the common fund created by their efforts is well within the benchmark range and in line with what is often awarded in this Circuit."); *Abadeer, et al., v. Tyson, et al.* 3:09-cv-125 (M.D. Tenn. Oct. 17, 2014) (awarding fees in the amount of $2,583,333, which was equal to 33.33% of the common fund, in hybrid FLSA/Rule 23 class action).

[12] *See* Hedgpeth Decl. ¶ 13.

out) would receive their share of the settlement. 2022 WL 18621782, at *2 (E.D. Okla. June 23, 2022). However, similar awards are also approved in cases where a smaller percentage of class or collective members share in the award. In *Candelaria v. Health Care Serv. Corp.*, for example, a case involving the same Defendant as the present cases and the same job position as the *Kuzma* case, the court awarded 35% of the common fund, noting that it was "consistent with the practice of district courts in the 10th Circuit." *Candelaria*, 2020 WL 6875828, at *3 (D.N.M. Nov. 4, 2020) (Gonzales, J.). The requested fees were found to be reasonable even though it was a claims-made settlement with only 58.3% of class members opting in. *See Candelaria v. Health Care Service Corp.*, No. 2:17-cv-404-KG-SMV, ECF 74, p. 8 (D.N.M.). Individuals were not required to file a claim form to participate in the present settlement, and checks will be sent to 100% of the Settlement Class Members. *See* Hedgpeth Decl. ¶ 13.

### 3.    The *Johnson* Factors Support the Fees Requested

In *Gottlieb v. Barry,* the Tenth Circuit directed that in determining a reasonable fee in a common fund case, "the court must consider the twelve *Johnson* factors" originally set forth by the Fifth Circuit.  *Gottlieb v. Barry,* 43 F.3d at 483 (citing *Johnson v. Georgia Highway Express.* Inc. 488 F.2d 714, 717-19 (5th Cir. 1974)). The *Johnson* factors are:

> (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the [prearranged] fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.[13]

Because the *Johnson* factors were developed in the context of a judgment in a case involving a fee-shifting statute, the Tenth Circuit held that the scheme should be modified when

---

[13] *Gottlieb v. Barry,* 43 F.3d at 482, n.4.

applied in a common fund case to better fit the setting. *See Brown v. Phillips Petroleum Co*., 838 F.2d 451, 456 (10th Cir. 1988). Not all factors will apply in every case. *Id*.; *see also Gudenkauf v. Stauffer Communications, Inc*., 158 F.3d 1074, 1083 (10th Cir. 1998) (trial court need not specifically address each factor in every case). Further, the weight assigned to each factor varies when the court is awarding fees from a common fund. *Brown*, 838 F. 2d at 456.

The most important difference in the application of the *Johnson* factors in common fund cases is the emphasis placed on the eighth factor—the result obtained by counsel. In a common fund case, the result obtained is the most important factor and deserves the greatest weight, particularly if "the recovery [is] highly contingent and…the efforts of counsel were instrumental in realizing recovery on behalf of the class." *Brown*, 838 F.2d at 456. As the Advisory Committee noted when adopting the 2003 amendments to Rule 23, "[f]or a percentage fee approach to fee measurement, results achieved is the basic starting point." FED. R. CIV. P. 23(h) advisory committee's note (2003).

The other important difference in the common-fund context is the diminished role of the first *Johnson* factor—the time and labor involved. *See Nakamura v. Wells Fargo Bank, Nat'l Ass'n*, 2019 WL 2185081, at *3 (D. Kan. May 21, 2019) ("While [the time and labor] factor guides the lodestar analysis in a statutory fee-shifting case, it is of minimal importance in a percentage-of-the-common-fund case.") (collecting cases). In *Brown*, the Tenth Circuit recognized the differences between common fund cases and statutory fee cases and held that courts are not required to perform a lodestar analysis in common fund cases. *Brown*, 838 F.2d 451 at 456.[14] As

---

[14] *See also* Section F, 1, *supra* (citing Tenth Circuit cases in which Courts awarded fees without lodestar cross check); *Chieftain Royalty Co. v. XTO Energy, Inc.,* No. CIV-11-29-KEW, 2018 WL 2296588, at *3 (E.D. Okla. Mar. 27, 2018) (neither lodestar analysis nor lodestar cross-check is required); *Childs v. Unified Life Ins. Co.*, No. 2011 WL 6016486, *15 n.10 (N.D. Okla. 2011) ("Because the other *Johnson* factors, combined, warrant approval of the common fund fee sought by Plaintiff's Counsel, the Court need not engage in a detailed, lodestar-type analysis of the 'time and labor required' factor.").

discussed below, each of the relevant *Johnson* factors support the requested fee.

### i.   The Amount Involved and the Results Obtained Justify the Requested Fee

As noted above, the most important factor in determining the reasonableness of attorneys' fees in a common fund settlement is the amount involved and the results obtained. *See* Section VI(C)(3), *supra*; *see also Oppenlander v. Standard Oil Co.*, 64 F.R.D. 597, 605 (D. Colo. 1974) ("While other criteria in determining reasonable attorney fees are legitimate considerations, the amount of the recovery, and end result achieved, is of primary importance.").

This factor weighs heavily in favor of approving the fee request in light of the excellent result Class Counsel obtained for the Settlement Class Members. Through their efforts during the prosecution and settlement of this litigation, Class Counsel has obtained a substantial recovery considering the risks of proceeding with litigation.

The Gross Settlement Amount represents a significant percentage of the alleged back wages Plaintiffs claim are owed to all Settlement Class Members, and all Settlement Class Members will be sent a check via U.S. Mail, representing their *pro rata* share of the Net Settlement Amount without the need to submit a claim form. *See* Hedgpeth Decl. ¶ 13. This is an excellent result for Settlement Class Members by any measure, given that Defendant vigorously disputed, among other things, that (i) the Settlement Class members were misclassified as exempt from the overtime requirements of the FLSA and the NMMWA, (ii) the Settlement Class Members worked more than forty hours per week, and (iii) collective action certification (conditional or otherwise) and/or class certification were appropriate.

Plaintiffs' Counsel also negotiated a favorable release for Settlement Class Members. As detailed in the Settlement Agreements, the scope of the release provided by the Settlement Class Members (other than Plaintiffs) is limited to a release of wage and hour claims through the date

on which the Settlement Agreements were signed. *See Ramah Navajo Chapter v. Babbitt,* 50 F. Supp. 2d 1091, 1103-04 (D.N.M. 1999) (noting that the limited, rather than general, nature of the release as further evidence of an exceptional result in favor of class members). Moreover, because, as noted above, this is *not* a claims-made settlement, every Settlement Class Member will receive a check for his or her pro rata share of the settlement.

The significant benefit conferred upon the Settlement Class Members supports the requested attorneys' fees. Further, because the recovery was highly contingent and the efforts of counsel were instrumental in realizing recovery on behalf of the class, this factor should be given even greater weight. *See In re Qwest Communications Intern., Inc. Sec. Litig.*, 625 F. Supp. 2d 1143, 1151 (D. Colo. 2009) (citing *Brown*, 838 F.2d at 456).

### ii.    The Time and Labor Required Supports the Requested Fee

Although the time and labor required is less important in a common fund settlement, Plaintiffs' counsel invested substantial time and labor in researching, investigating, prosecuting, and resolving this case. *See* Sections II and III, *supra*. This included spending a significant amount of time researching, briefing, and arguing before the Court regarding a relatively novel issue— whether the New Mexico Minimum Wage Act allows for a class that includes individuals whose claims arose prior to the 3-year limitations period. *Id.* After prevailing on this issue in the *Kuzma* lawsuit, Plaintiffs' counsel spent the next several months preparing for mediation, which included regular conferences with Plaintiffs, Opt-in Plaintiffs, and Defendant; reviewing documentation received from Plaintiffs and Defendant; preparing damage models for use at mediation; and researching and analyzing (1) the factual and legal basis for Defendant's defenses, (2) the job duties performed by Plaintiffs and the Settlement Class Members, and (3) regulations relating to Medicaid administration. *See* Section III, *supra*. Following the mediation, Plaintiffs' counsel spent

several additional months negotiating the Settlement Agreements. *Id.*

### iii.   The Novelty and Difficulty of the Questions Involved Warrant Approval of the Requested Fees

By their nature, overtime misclassification cases are often factually and legally complex. *See Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 743 (1981) ("FLSA claims typically involve complex mixed questions of fact and law…These statutory questions must be resolved in light of volumes of legislative history and over four decades of legal interpretation and administrative rulings."). These cases were no exception, as they each involved (1) complicated factual questions relating to the contractual requirements between Defendant and the New Mexico Human Services Department, Defendant's corporate policies, the job duties performed by hundreds of employees, and the number of hours worked by those employees, and (2) legal questions regarding the applicability of the administrative exemption, the professional exemption, and the combination exemption. Moreover, the cases not only involved collective action claims under the FLSA, but class action claims under New Mexico state law. Such hybrid class and collective actions are generally regarded as the most complex in the wage-and-hour field. *See Sukhnandan v. Royal Health Care of Long Island LLC*, No. 12 cv 4216, 2014 WL 3778173, at *10 (S.D.N.Y. July 31, 2014) ("Among FLSA cases, the most complex type is the 'hybrid' action brought here."). The difficulty of the factual and legal issues in this case weigh heavily in favor of approval of the fees requested.

### iv.   The Skill Required and the Experience, Reputation, and Ability of Plaintiffs' Counsel Support the Requested Fee

Prosecuting a hybrid action is challenging and requires attorneys experienced in wage-and-hour litigation. The attorneys at The Hedgpeth Law Firm, P.C. and Siegel Law Group PLLC are highly experienced class and collective action litigators. *See* Exhibit D to Motion for Preliminary

Approval (ECF 48-4); *see also Heckle v. Matrix Absence Mgmt., Inc.*, 2022 WL 17666401, at *5 (S.D.N.Y. Dec. 14, 2022) (appointing Travis Hedgpeth and Jack Siegel as class counsel, noting that they "are experienced and qualified class action lawyers who specialize in wage and hour actions"); *Del Toro v. Centene Management Company, LLC*, 2021 WL 1784368, at *3 (E.D. Mo. May 5, 2021) (appointing Travis Hedgpeth and Jack Siegel as class counsel in connection with class settlement, citing to "their expertise and experience in class action litigation, including FLSA litigation specifically").

Not only are Class Counsel highly experienced in wage and hour litigation generally, they have significant experience in cases involving the claims alleging the misclassification of care management employees (including care coordinators) specifically. *See* Exhibit D to Motion for Preliminary Approval (ECF 48-4).[15] They have represented thousands of care management employees in cases against many of the largest healthcare companies in the country and have broad knowledge of federal and state regulations relating to Medicaid administration, as well as an understanding of how these regulations may relate to overtime misclassification claims. *Id.* They are also both contributing authors for the wage and hour treatise *Wage and Hour Laws: A State-by-State Survey*, published by Bloomberg BNA in conjunction with the American Bar Association Section of Labor and Employment Law. *Id.*; *see also* Hedgpeth Decl. ¶ 14.

"The quality of opposing counsel is also important in evaluating the quality of [services rendered by Plaintiffs' counsel]." *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 749 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986). Defendant is represented by experienced and skilled defense counsel. BakerHostetler is a large, highly-regarded law firm, and the attorneys

---

[15] Although the declaration attached to the Motion for Preliminary Approval relates specifically to Travis Hedgpeth's experience, all the cases listed were jointly litigated by Messrs. Hedgpeth and Siegel as co-counsel. *See* Hedgpeth Decl. ¶ 14.

involved in this case have significant experience representing companies in complex wage and hour litigation.[16]

The skill, experience, reputation, and ability of both Plaintiffs' and Defendants' counsel further support the requested fee award.

### v.      The Preclusion of Other Employment by Plaintiffs' Counsel Supports the Requested Fee

Due to the small size of Plaintiffs' counsel's law firms, case management—including decisions regarding which, and how many, cases to take—is extremely important. This is especially true given that Plaintiffs' counsel specialize in complex class litigation:

> Attorneys attempting to handle a large class such as this are precluded by the ticking of the clock from taking certain other cases given that they have decided to take a chance on a possible recovery in a contingent fee case rather than strictly working on paid hourly wages. There is, of course, the possibility in a case of this kind that the lawyer, having given up other cases in order to actively pursue this case, will actually recover no payment for his time and efforts.

*Whittington v. Taco Bell of Am., Inc*., 2013 WL 6022972, at *6 (D. Colo. Nov. 13, 2013).

The present cases were large, complicated, hybrid wage and hour cases which, had they not settled, would have required thousands of hours over the course of several years, including appeals. As a result, once Plaintiffs' counsel accepted representation of Plaintiffs, they necessarily had to reduce their case generation efforts, as failure to do so could easily result in both firms becoming overwhelmed. *See* Hedgpeth Decl. ¶ 15.

### vi.     Class Counsel's Fee Request Is Consistent with the Customary Fee Arrangement in Similar Cases

"Class actions typically involve a contingent fee arrangement because it insulates the class from the risk of incurring legal fees and shifts that risk to counsel." *Nieberding v. Barrette Outdoor*

---

[16]  https://www.bakerlaw.com/professionals/mark-d-temple/
https://www.bakerlaw.com/professionals/peter-j-stuhldreher/

*Living, Inc.*, 129 F. Supp. 3d 1236, 1250 (D. Kan. 2015) (citing *Freebird, Inc.*, 2013 WL 1151264, at *4); *see also Bailes v. Lineage Logistis, LLC*, 2017 WL 4758927, at *5 (D. Kan. Oct. 20, 2017) ("In class action cases such as this one, the customary fee is a contingency arrangement based on a percentage of the common fund.") (citing *Ramah Navajo Chapter v. Babbitt*, 50 F. Supp. 2d 1091, 1104 (D.N.M May 25, 1999). Here, Plaintiffs and Class Counsel negotiated and agreed to prosecute this case based on a 40% contingent fee. Hedgpeth Decl. ¶ 16. However, Class Counsel voluntarily reduced the fee request to 35% to assist in reaching a settlement. *Id.*; *see also Bailes v. Lineage Logistics, LLC*, No. 15-2457-DDC-TJJ, 2017 WL 4758927, at *6 (D. Kan. Oct. 20, 2017) (approving fee request where "plaintiff and his counsel agreed to a contingency fee arrangement where plaintiff agreed to pay counsel 40% of any common-fund-settlement recovery" but "counsel voluntarily reduced its contingency fee request to 33%")

### vii. The Contingent Nature of the Fee Weighs in Favor of the Requested Award

Plaintiffs' counsel took this case on a fully contingent basis, with the risk that they would not recover any compensation for the legal services provided. Hedgpeth Decl. ¶ 16. Plaintiffs faced the risk that the Court would conclude that one of Defendant's affirmative defenses was meritorious, including the defense that one or more of the positions at issue were exempt from the requirements of the FLSA and state law under the administrative, professional or combination exemptions. This risk was exacerbated by the fact that the Settlement Class Members primarily performed case management and care coordination duties, and individuals in similar positions have been deemed exempt by courts in multiple jurisdictions. *See Chatfield v. Children's Services, Inc.,* 555 F. Supp. 2d 532 (E.D. Penn. 2008); *Jaggers v. Odyssey Healthcare, Inc.,* No. 2:05-cv-3385, 2006 WL 8447922 (D.S.C. Nov. 14, 2006); *Unruh v. Humana Insurance Company,* No. 17-cv-1782, 2019 WL 4648934 (N.D. Ill. Sept. 24, 2019); *Williams v. Genex Services, LLC*, 809 F.3d

103 (4th Cir. 2015); *Isett v. Aetna Life Ins. Co.*, 947 F.3d 122, 125–26 (2d Cir. 2020).

Plaintiffs' counsel understood from the outset that they were embarking on a complex and potentially expensive and lengthy litigation which would require a significant investment of attorney time with no guarantee of ever being compensated for such investment. Plaintiffs' counsel also understood that Defendant would (and, in fact, did) retain a large and highly experienced corporate defense firm to mount a strong defense.

The risks of contingent litigation are multiplied in a case that involves a developing area of law, as dramatic changes in the law can occur. Plaintiffs' counsel experienced this firsthand when the Second Circuit issued an opinion in *Isett v. Aetna Life Ins. Co.*, 947 F.3d 122 (2d Cir. 2020), holding that the plaintiff (an RN who reviewed denials of claims for medical services) was an exempt professional employee. This decision drastically affected several cases Plaintiffs' Counsel were litigating within the Second Circuit. Plaintiffs' counsel faced the same risks in this case. The fact that Plaintiffs' counsel bore these significant risks with no assurance of compensation supports the request for attorneys' fees.

### viii. <u>The Complexity, Required Skill, and Inherently Uncertain Nature of This Litigation Makes It Undesirable for Most Attorneys</u>

The complexity of the issues involved in these lawsuits and the fact that prosecuting them competently requires knowledge in two complicated and disparate areas of the law—state and federal overtime laws and care management regulations—makes this case undesirable for even experienced wage-and-hour attorneys. *See Cab Siquic v. Star Forestry, LLC*, No. 13-cv-43, 2016 WL 1650800, at *2 (W.D. Va. Apr. 22, 2016) (noting that the case "required counsel to be familiar with the H-2B regulatory scheme as well as the FLSA" and that "such complexities would have made this case undesirable to other firms in the legal community."); *see also McCurley v. Flowers*

*Foods, Inc.*, No. 16-cv-194, 2018 WL 6650138, at *6 (D.S.C. Sept. 10, 2018) ("Lawsuits that are undesirable, either because of novelty of the issue or difficult of the litigation, are eligible for premium attorney's fees."). As noted by one court:

> I find that the time and effort that this case has taken and the complexity of the issues would make it undesirable to many attorneys….Furthermore, the legal theories involved required substantial expertise in the wage and hour field. Many attorneys would not have understood the nuanced arguments asserted, nor would they have been able to discern whether the Plaintiff even had a viable claim. Additionally, other lawyers may not have had the expertise to ascertain and evaluate the possible damages awards available to the Class members in this case. Thus, the work of Plaintiff's Counsel provided a significant benefit to the Class Members. Had this case not settled, Plaintiff's Counsel would have vigorously litigated the case without any promise of success and compensation.

*Acevedo v. Sw. Airlines Co.*, No. 16-cv-24, 2019 WL 6712298, at *5 (D.N.M. Dec. 10, 2019).

Because these cases involved (1) complicated issues of fact relating to hundreds of individuals, (2) complex legal issues spanning multiple areas of law, (3) a sophisticated defendant that was certain to hire experienced defense counsel, and (4) a legitimate risk that Plaintiffs' counsel would expend significant time and money on the case only to receive no compensation, this case would be undesirable to the vast majority of attorneys.[17]

### ix.    The Fee Request Is Consistent with Awards in Similar Cases

As discussed above, Plaintiffs' counsel's request for 35% of the fund is consistent with percentages approved as fair and reasonable by other courts in this Circuit in other complex class and collective actions. *See* Section VI(C)(2), *supra*.

### 4.    No Class Members Objected to or Opted Out of the Settlements

Finally, in addition to the requested fee (1) conforming to the Tenth Circuit's standard for attorneys' fees in common fund cases, (2) falling within the range of fees approved in the Tenth

---

[17] "Undesirability and relevant risks must be evaluated from the standpoint of plaintiffs' counsel as of the time they commenced the suit, not retroactively, with the benefit of hindsight." *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1364 (S.D. Fla. 2011).

Circuit, and (3) satisfying the *Johnson* factors, the fact that not a single Class Member objected to or opted out of the settlements weighs in favor of approving the requested fee (and the settlements generally). *See Nakamura v. Wells Fargo Bank, Nat'l Ass'n*, 2019 WL 2185081, at *2 (D. Kan. May 21, 2019) ("The fact that no member of the Settlement Class elected to be excluded from the Settlement or objected to the Settlement bolsters the court's confidence in the results Class Counsel has obtained."). This indicates that the settlements, including the fee request (which was included in the class notice), were not only acceptable to Plaintiffs and Plaintiffs' counsel, but also to the Class Members generally.

### D.    Plaintiffs' Counsel's Requested Expenses Are Reasonable

Plaintiffs' counsel also seek to recover $14,488.39 in litigation costs. These costs were incurred in pursuing this litigation and include: complaint filing fees ($800), service of process ($330), mediation fee ($10,000), and travel expenses (hotel, flights, and other travel expenses for mediation and hearings) ($3,358.39). Hedgpeth Decl. ¶ 17.[18] The litigation costs for which Plaintiffs' Counsel seeks reimbursement are reasonable and are of the kind and character typically reimbursed from a settlement fund. *See, e.g.*, *Netzel v. West Shore Group, Inc.*, 2017 WL 1906955, at *9 (D. Minn. May 8, 2017) (explaining that, consistent with Supreme Court precedent, courts routinely approve reimbursement from a settlement fund for expenses such as "travel, meals, lodging, photocopying, long-distance telephone calls, computer legal research, postage, courier service, mediation, exhibits, document scanning, and visual equipment").

### E.    The Court Should Enter an Interim Order to Accommodate the Requirements of the Class Action Fairness Act

The Class Action Fairness Act ("CAFA") requires that defendants who settle any class

---

[18] Because travel expenses for the upcoming final approval hearing had not yet been incurred, those expenses were not included in the Motion for Preliminary Approval and are therefore not being requested for reimbursement.

action in federal court provide notice of the settlement to the federal and relevant state governments. *See* 28 U.S.C. § 1715(b). The notices must be sent (1) within 10 days after the proposed settlement is filed in court (28 U.S.C. § 1715(b)); and (2) at least 90 days before final approval is granted (28 U.S.C. § 1715(d)). In this case, the CAFA notices did not go out in accordance with these deadlines due to a misunderstanding. When the misunderstanding came to light the CAFA notices were issued immediately on August 1, 2024, to remedy the issue. Although sent more than 10 days after the Settlement Agreements were filed with the Court, courts have held that the CAFA notice requirements are substantially complied with where the notices are sent at least 90 days before final approval is granted. *Azar v. Blount Int'l, Inc.*, No. 3:16-cv-0483-SI, 2019 WL 7372658, *8 (D. Oregon Dec. 31, 2019) ("Many courts have held 'that late mailing of notices to state and federal officials under CAFA is not fatal to approval of settlements.'"); *citing Adoma v. Univ. of Phoenix, Inc.*, 913 F. Supp. 2d 964, 973 (E.D. Cal. 2012); *Thomas v. Magnachip Semiconductor Corp.*, No. 14-cv-01160-JST, 2017 U.S. Dist. LEXIS 189971, at *5 (N.D. Cal. Nov. 16, 2017) ("Although Avenue Capital's notice was late, it is sufficient as long as the relevant state and federal officials have at least ninety days to review the proposed settlement."); *Jakosalem v. Air Serv Corp.*, No. 13-cv-05944-SI, 2015 U.S. Dist. LEXIS 117235, at *2-3 (N.D. Cal. Sep. 2, 2015) ("Courts have found that CAFA's notice requirements have been substantially complied with when the relevant state and federal officials have had 90 days to review the proposed settlement, even when notice was sent out late.").

To expedite getting this matter closed without taking up more of the Court's time, the parties propose that the Court enter the attached Order Granting Interim/Final Approval of Class Action Settlement. Such Order approves the Settlement Agreements on an interim basis and becomes final upon the expiration of the relevant ninety-day CAFA notice period. If any issues

are raised by any state or federal officials, then the Order stays in place on an interim basis until the issues are addressed.

## VII.    <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs respectfully request that the Court issue an Order that (1) grants final approval of the Settlement Agreements; (2) permanently certifies the Rule 23 Settlement Classes for purposes of the settlement only; (3) approves Plaintiffs' counsel's requested attorneys' fees and litigation expenses/costs; (4) approves payment to the Third-Party Administrator; and (5) dismisses this matter with prejudice.

Respectfully submitted,

*s/Travis M. Hedgpeth*

TRAVIS M. HEDGPETH
Texas Bar No. 24074386
THE HEDGPETH LAW FIRM, PC
3050 Post Oak Blvd., Suite 510
Houston, Texas 77056
P: (281) 572-0727
travis@hedgpethlaw.com

JACK SIEGEL
Jack@siegellawgroup.biz
Texas Bar No. 24070621
Siegel Law Group PLLC
5706 E. Mockingbird Lane | Suite 115
Dallas, Texas 75206
P: (214) 790-4454
www.4overtimelawyer.com

**Attorneys for Plaintiffs**

31